# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ARCHIE MYRICK | : | CIVIL ACTION |
|---|---|---|
| v. | : | |
| | : | NO. 17-515 |
| NANCY A. BERRYHILL | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                                       **February 7, 2018**

Archie Myrick asks we reverse or remand an administrative law judge's detailed finding he does not presently suffer a disability qualifying him for benefits based on his subjective complaints of physical impairments which, in many instances, are contradicted by medical records or otherwise unsupported. He also challenges the judge's reliance on the vocational expert's findings. After close study of the administrative law judge's findings and the underlying record, we find substantial evidence for the denial of Social Security Disability and Supplemental Security Income benefits to Mr. Myrick based on his present claims. In the accompanying Order, we deny Mr. Myrick's petition.

## I. Background

Sixty-one year old Archie Myrick graduated high school and attended two years of college.[1] In 1968, Mr. Myrick tore a ligament in his left knee and recently the injury became more painful.[2] The Social Security Administration provided Mr. Myrick with Supplemental Security Income from 1989 until 2011 after finding a "severe impairment" of schizophrenia.[3] Mr. Myrick is not presently diagnosed with schizophrenia.[4] Sometime before 2010, Mr. Myrick was shot in the stomach requiring two surgeries to recover.[5]

### A. Medical records for Mr. Myrick's knee, hip, and back pain.

Mr. Myrick's medical records evidence early or mild osteoarthritis in his knee, hip, and spine. In October 2010, medical imaging of Mr. Myrick's lumbar spine showed mild fact osteoarthritis and bullet fragments.[6]

In November 2012, while incarcerated at SCI Waymart, Mr. Myrick had x-rays which showed "hypertrophic change at the tibial spines" in his left knee leading to an "impression of "early degenerative joint disease."[7] The x-ray also showed his "bony pelvis and hips are within normal limits" and the bullet fragments.[8] Mr. Myrick had a second x-ray on his lumbar spine in January 2013, which showed "mild multilevel degenerative disc disease" with "mild narrowing and degeneration of the lumbar disks at all levels, with satisfactory alignment."[9] The bullet fragments were also visible.[10] In Mr. Myrick's SCI Waymart medical summary, the physical limitations section prohibits sports and weight lifting and identifies a special need as a lower bunk.[11] The employment limitations section prohibits intensive labor, pushing, squatting, standing, or lifting.[12]

### B. Mr. Myrick's 2013 application for benefits and medical review.

In August 2013, Mr. Myrick filed for Social Security Disability and Supplemental Security Income benefits as of August 14, 1989.[13] Mr. Myrick cited three disabilities: paranoid schizophrenia, pain in knees and lower back, and stomach injury caused by the shooting.

*Medical evaluation after Mr. Myrick's Social Security petition.*

On December 17, 2013, Dr. David Knox, evaluated Mr. Myrick in connection with this petition and found his gait and station normal and with no difficulty getting on the examination table or removing his shirt.[14] Dr. Knox noted Mr. Myrick had crepitus in both knees.[15] Dr. Knox found Mr. Myrick had a full range of motion in his ankles, knees, hips, shoulders, elbows,

2

and wrist joints and his neuro examination is unremarkable.[16] Dr. Knox's found Mr. Myrick had chronic low back pain and degenerative joint disease involving both knees with a "fair" prognosis.[17]

The medical consultant's physical assessment found Mr. Myrick could occasionally carry 50 pounds, frequently carry 25 pounds, stand/walk for 6 hours of an 8 hour day, sit for 6 hours of an 8 hour day but had limited ability to pull/push in his lower extremities.[18] It also found Mr. Myrick had postural limitations occasionally when climbing ladders and frequently when kneeling or crawling.[19] Mr. Myrick should not be exposed to extreme cold or concentrated exposure to wetness.[20]

### C.  Treating physician Dr. Gold's reports.

Following release from SCI Waymart, Mr. Myrick began treating with Dr. Joseph Gold as his primary care physician. Dr. Gold's records evidence Mr. Myrick sporadically complained of back/knee/hip pain. In February 2014, Dr. Gold saw Mr. Myrick and recorded Mr. Myrick's chief complaint as "RX Refill/Pain in back and under right knee."[21] Dr. Gold found Mr. Myrick had a normal gait, normal range of motion, no tenderness, and no deformity.[22] In April 2014, Mr. Myrick saw Dr. Gold for a check-up and Mr. Myrick had a normal range of motion and a normal gait.[23]

In June 2014, Dr. Gold saw Mr. Myrick and reported no back pain, no joint pain, and no decreased range of motion.[24] Dr. Gold noted Mr. Myrick has a normal gait, normal range of motion, and normal strength.[25] In August 2014, Mr. Myrick visited Dr. Gold for a prescription refill and Dr. Gold noted he had a normal gait and normal range of motion.[26] Dr. Gold saw Mr. Myrick again in September 2014 and Mr. Myrick complained of knee pain for two days and rated the pain a five out of ten.[27] Dr. Gold noted Mr. Myrick had a normal gait, normal range of

3

motion, no tenderness, and no swelling.[28] Dr. Gold saw Mr. Myrick in December 2014 for a cold and RX refill.[29] Mr. Myrick then complained of mild pain in his lower back region.[30]

In April 2015, Mr. Myrick called Dr. Gold's office to report pain in his right knee for the past month.[31] Dr. Gold saw Mr. Myrick and noted he had a normal gait and normal range of motion.[32] Dr. Gold ordered x-rays of Mr. Myrick's right knee and hip.[33] In May 2015, doctors examined Mr. Myrick's right hip and knee.[34] Mr. Myrick's right knee had "mild spurring along the tibial spines" and "patellofemoral compartment" but did not have visible "joint effusion."[35] The doctor's impression of Mr. Myrick's knee after the exam is "mild osteoarthritis predominantly involving the patellofemoral compartment."[36] Mr. Myrick's hip examination showed bullet fragments from his earlier gunshot wound.[37] His hip also showed an "[o]bliquely oriented linear ossification projecting over the right obturator foramen unchanged since 2006 and corresponds to tendinous ossification of the right gluteus maximus muscle."[38] The doctor's impression is "early right hip osteoarthritis."[39]

Dr. Gold saw Mr. Myrick again in September 2015 complaining of a cold and asking for a prescription refill.[40] Dr. Gold noted Mr. Myrick had no back pain, no neck pain, no joint pain, and no decreased range of motion and also had normal gait, normal range of motion, and normal strength.[41]

### D. Mr. Myrick's daily life as described to the administrative law judge.

Mr. Myrick lived with his mother until her death in February 2014.[42] Before his mother's passing, Mr. Myrick cared for her by cooking for her and giving her medication.[43] Mr. Myrick plays the bass guitar weekly and plays video games.[44] Mr. Myrick's sister takes him shopping about once a week and he prepares his own meals three or four times a week which can take from 45 minutes to 3 hours.[45] Mr. Myrick also does his own laundry, vacuums, handles his own

4

finances, and takes care of his own personal hygiene needs.[46] Mr. Myrick watches television but does not follow the plot because his mind gets distracted. He reads books but stops after a few pages.[47] Mr. Myrick finishes what he starts, follows written instructions "well," and follows spoken instructions "pretty well."[48] Mr. Myrick says he could not walk more than 8 blocks before he needed to rest for 3 minutes.[49] Mr. Myrick does not medicate for his conditions.[50] Mr. Myrick hears voices but "but thinks it's [his] subconscious" and does not obey them.[51] Mr. Myrick spends 12-16 hours a day laying in bed to relieve his back pain.[52] Mr. Myrick does not have a driver's license but uses public transportation.[53]

### E. The Social Security Administration's denial of benefits.

The Social Security Administration denied Mr. Myrick's application.[54] Mr. Myrick requested a hearing before an administrative law judge.[55]

On January 7, 2016, Mr. Myrick appeared before Administrative Law Judge Jennifer M. Lash for his hearing.[56] At the hearing, Mr. Myrick amended the onset date for benefits to August 27, 2013.[57] On March 31, 2016, ALJ Lash denied Mr. Myrick's claims.[58] Applying the five step analysis outlined below, ALJ Lash concluded Mr. Myrick did not suffer a disability under the Social Security Act ("Act") as of August 27, 2013 to the date of her decision.[59]

ALJ Lash found Mr. Myrick suffered from "severe" impairments: bilateral knee disorders; right hip disorder; disorders of the back; status post gunshot wound; an affective disorder; and polysubstance dependence.[60] ALJ Lash found none of Mr. Myrick's impairments or combination of impairments meets or medically equals the severity of listed impairments in the Code of Federal Regulations.[61] ALJ Lash found Mr. Myrick's hip and knee disorders do not meet the definition of severe because Mr. Myrick can ambulate effectively.[62] ALJ Lash found Mr. Myrick's back disorder does not meet the definition of severe because there is no evidence

of the criteria in the regulations.[63] ALJ Lash also found Mr. Myrick's mental impairments individually or combined did not meet the definition of severe because Mr. Myrick has no restrictions in his daily living, has no difficulty in his social functioning, has moderate difficult with concentration, persistence, and pace, and has no episodes of decompensation.[64]

ALJ Lash found Mr. Myrick's medically determinable impairments could cause his difficulties lifting, squatting, bending, standing, walking, sitting, kneeling, and stair climbing but found Mr. Myrick's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the evidence."[65] For Mr. Myrick's physical impairments, ALJ Lash found Mr. Myrick had a normal gait and normal range of motion at most of his examinations and the medical imaging of his knee and back only showed early and mild osteoarthritis after the alleged onset date of his disability.[66] ALJ Lash also found Mr. Myrick only received treatment "essentially routine and/or conservative in nature" and the kind of treatment expected for a totally disabled individual.[67] For Mr. Myrick's mental impairments, ALJ Lash found the overall record showed Mr. Myrick can perform activities necessary to obtain and maintain employment and he is stable and maintained his sobriety.[68]

ALJ Lash considered Mr. Myrick's age, education, experience, and residual functioning capacity and found Mr. Myrick could perform jobs existing in significant numbers in the national economy.[69] ALJ Lash found Mr. Myrick has a residual functioning capacity to perform medium work except for additional limitations: no frequent operation of foot controls; frequent balancing, stooping, kneeling, crouching, crawling and climbing of ramps and stairs; and occasional climbing of ladders, ropes and scaffolds.[70] ALJ Lash also found Mr. Myrick must avoid frequent exposure to extreme cold, wetness and hazards, including moving machinery and unprotected heights, and he is limited to unskilled work with routine, repetitive tasks secondary to a moderate

6

limitation in the ability to maintain concentration, persistence, and pace.[71] ALJ Lash determined Mr. Myrick had no past relevant work.[72]

After ALJ Lash determined Mr. Myrick's limitations, she then posed hypothetical questions to Vocational Expert Eric Dennison. ALJ Lash asked Mr. Dennison if jobs exist in the nation economy for an individual matching Mr. Myrick's age and education level and who had no past relevant work experience.[73] ALJ Lash asked Mr. Dennison to assume this individual "can perform a range of medium exertional work with no frequent operation of foot controls, can perform frequent balancing, stooping, kneeling, crouching, crawling and occasional climbing of ladders, ropes, and scaffolds; must avoid frequent exposure to extreme cold, wetness and hazards, including moving machinery and unprotected heights and would be limited to unskilled work with routine, repetitive tasks secondary to a moderate limitation of the ability to maintain concentration, persistence or pace…"[74] Mr. Dennison testified positions are available for this hypothetical individual and identified a linen room attendant, press tender, and a checker as a "representative sampling of job available" for someone with these limitations.[75] Based on the testimony of Mr. Dennison, ALJ Lash concluded Mr. Myrick is not disabled as defined by the Act since August 27, 2013.[76]

## II. Analysis

Mr. Myrick timely requested our review arguing ALJ Lash erred (1) in finding Mr. Myrick can perform a limited range of medium work, and (2) in relying on the testimony of Vocational Expert Eric Dennison because ALJ Lash's hypothetical question to the expert did not include all of Mr. Myrick's impairments. Mr. Myrick argues ALJ Lash's finding he can perform a limited range of medium work is not supported by substantial evidence because ALJ Lash failed to account for his subjective complaints concerning his knee, hip, and gunshot wound

7

impairments supported by his medical records and ALJ Lash assigned little weight to Dr. Knox's opinion but then used it to support some of her findings. Mr. Myrick argues ALJ Lash erred in relying on the vocational expert's testimony because ALJ Lash's hypothetical questions "did not properly include the moderate limitations in concentration, persistence or pace" found by ALJ Lash.[77]

Our review of ALJ Lash's decision is deferential and ALJ Lash's findings of fact are conclusive if supported by substantial evidence.[78] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[79] Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."[80] To determine whether substantial evidence supports a factual finding, we review the record as a whole.[81] We are bound by the ALJ's factual findings if supported by substantial evidence, even if we would decide the matter differently after hearing the evidence and evaluating the witnesses.[82]

An ALJ must determine whether the claimant is disabled when examining a challenge to the Commissioner's initial decision denying benefits. Under Title II of the Act, a person who has contributed to the program who suffers from a physical or mental disability is afforded insurance benefits.[83] Under Title XVI of the Act, a disabled person may also be entitled to supplemental security income.[84] A disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[85] A claimant is only disabled if their impairments are severe to the point it makes their previous work impossible to do or precludes any other kind of gainful work available in the national economy.[86]

8

The Commissioner applies a five-step evaluation to determine if a claimant is disabled.[87] If the Commissioner finds disability or non-disability at any step during the analysis, the Commissioner will end the analysis.[88] Under step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity.[89] If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two and is required to determine whether the claimant is suffering from a severe impairment or combination of impairments.[90] Under step three, if the claimant's impairments are severe, the Commissioner compares the impairments to a list of impairments presumed severe enough to preclude gainful employment.[91] If the claimant's impairments or its equivalent match a listed impairment, the claimant is presumed disabled.[92] If the claimant's impairments do not match impairments on the list, the Commissioner proceeds to step four, where the Commissioner determines the claimant's residual functional capacity ("RFC").[93] A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[94] In step five, if the claimant is unable to return to past work, the Commissioner must prove "there are other jobs existing in significant numbers in the national economy which claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]."[95]

### A. ALJ Lash's finding Mr. Myrick can perform medium work with limitations is supported by substantial evidence.

Mr. Myrick argues ALJ Lash's finding he has a residual functioning capacity to perform medium work with specific limitations is not supported by substantial evidence.[96] Mr. Myrick argues ALJ Lash failed to account for his subjective complaints of back and knee pain and failed to consider his medical records showing arthritis in his lower spine and knee. He argues ALJ Lash assigned little weight to Dr. Knox's opinion then relied on portions of his opinion to support her finding Mr. Myrick could perform medium work with limitations and improperly

9

disregarded Dr. Knox's assessments of Mr. Myrick's limitations.

Mr. Myrick argues the medical evidence supports his complaints of pain and ALJ Lash erred in disregarding them. Our court of appeals directs "[w]here medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence."[97] ALJ Lash's finding Mr. Myrick's knee, hip, and back impairments are not as severe as his subjective complaints is supported by her citation to substantial contrary medical evidence, including Mr. Myrick's treating records confirming he often did not complain about pain, received minimal, basic treatment for his impairments, objective medical imaging showed only mild or early osteoarthritis, and Mr. Myrick's own testimony and statements about his ability to function.

### 1. Mr. Myrick's medical records with Dr. Gold.

Mr. Myrick submitted his medical records from his treating doctor, Dr. Gold, covering eight visits from February 2014 to September 2015. At every visit, Dr. Gold examined Mr. Myrick and found he had a normal gait and range of motion. Mr. Myrick complained of pain in his knees at three visits, February 2014, September 2014, and April 2015 and mild back pain at one visit in December 2014. At the other five visits, Mr. Myrick did not report back pain, neck pain, joint pain, or decreased range of motion.

ALJ Lash also found Mr. Myrick's subjective complaints are belied when Mr. Myrick does not receive physical therapy or other treatment and did not use a cane or other mobility device for his knee/hip/back impairments. ALJ Lash found the medical imaging of Mr. Myrick's knees, hips, and back is not consistent with Mr. Myrick's subjective complaints because they showed only mild or early osteoarthritis with no fractures and the remnants of bullet fragments.

10

### 2. Mr. Myrick's medical history with Dr. Knox.

Mr. Myrick objects to ALJ Lash's according little weight to Dr. Knox's findings but then also relying on his findings at other points. In his consultative examination, Dr. Knox found Mr. Myrick could lift 100 pounds occasionally and 21-50 pounds frequently, had no foot control restrictions, and could perform frequent postural activities. ALJ Lash accorded it little weight because other evidence shows Mr. Myrick is more limited than Dr. Knox assessed and Dr. Knox only assessed Mr. Myrick once.[98] Mr. Myrick objects because, at other points in her analysis, ALJ Lash relies on Dr. Knox's observation Mr. Myrick had normal reflexes, normal gait and station, and no difficulty getting on the examination table or removing his shirt. ALJ Lash refers to this observation of Dr. Knox when she is discussing the medical evidence of Mr. Myrick having a normal gait, normal station, and normal range of motion, including Mr. Myrick's eight visits with Dr. Gold and his consultation with Dr. Knox. ALJ Lash found a consensus on Mr. Myrick's gait, station, and range of motion supported by substantial evidence. Her findings do not contradict her rejecting Dr. Knox's assessment of Mr. Myrick's limitations as not in line with other medical evidence.

### 3. Mr. Myrick's medical assessment from SCI Waymart.

Mr. Myrick also objects to ALJ Lash's decision to afford little weight to SCI Waymart's medical assessment.

ALJ Lash's decision to give little weight to this medical assessment because of the lack of support from the SCI Waymart's medical records compared to the record as a whole. ALJ Lash found the limitations imposed lacked support in the medical record because Mr. Myrick's x-rays showed "early degenerative joint disease" in his knees but no acute disease or fractures and in his lumbar spine "mild multilevel degenerative disc disease" but found no compression

11

fractures.[99] ALJ Lash also found SCI Waymart's limitations were not supported by the rest of record which includes Mr. Myrick's treatment history with Dr. Gold, his consultation with Dr. Knox, and the other medical imaging of his knee, hip, and back impairments. ALJ Lash reviewed the entire record and her analysis is based on substantial evidence.

### 4. Mr. Myrick's testimony and statements about his daily activities.

Mr. Myrick also argues ALJ Lash erred in finding he had a residual functioning capacity to perform medium work by relying on his ability to live independently in completing chores, cooking meals, playing video games and bass guitar, stating he might work again, and because he cared for his mother before she passed away. Mr. Myrick argues ALJ Lash places too much reliance on Mr. Myrick's testimony about his abilities to function in daily life in finding he is not disabled.

ALJ Lash properly considered Mr. Myrick's daily activities in assessing Mr. Myrick's disability and symptoms.[100] Mr. Myrick argues we should reverse ALJ Lash for relying too heavily on his own testimony and not the medical evidence under *Smith v. Califano*.[101] In *Smith*, the claimant suffered with a chronic ulcer disease for eighteen years and chronic anxiety.[102] In finding the claimant not disabled, the ALJ discounted the claimant's and a doctor's testimony about his disabling pain based on claimant's testimony "he had full use of his hands, arms and legs, does shopping and last fall went hunting twice."[103] Our court of appeals reversed because the ALJ erred in relying on claimant's sporadic activities to find the claimant did not have disabling pain where there was no medical evidence contrary to the fact claimant suffered disabling pain.[104]

Mr. Myrick's case is much different. ALJ Lash relied on contrary medical evidence and Mr. Myrick's testimony to find he had residual functioning capacity. In *Smith,* the ALJ found a

12

claimant not disabled based solely on his testimony where all medical evidence was in the claimant's favor.[105] ALJ Lash did not err in considering Mr. Myrick's testimony about his daily functioning because she also relied and cited his medical records and treatments to find he is not disabled.

ALJ Lash's finding the objective medical evidence does not support the full extent of Mr. Myrick's subjective complaints of pain is supported by substantial evidence including his medical records from Dr. Gold, the imaging of his knees, hips, and back, and the lack of non-routine or non-conservative treatment from the onset date of his disability.

### B. ALJ Lash's hypothetical question to the vocational expert properly included Mr. Myrick's limitations.

Mr. Myrick argues ALJ Lash erred in relying on the vocational expert's testimony because ALJ Lash's hypothetical questions "did not properly include the moderate limitations in concentration, persistence or pace" found by ALJ Lash.[106] An ALJ's hypothetical must include "all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."[107] Our court of appeals directs the hypothetical question must "specifically convey" the limitations.[108]

Based on his mental impairments, ALJ Lash found Mr. Myrick had "moderate difficulties" maintaining his concentration, persistence, pace.[109] ALJ Lash found Mr. Myrick's residual functional capacity to perform medium work had an additional limitation to "unskilled work with routine, repetitive tasks secondary to a moderate limitation in the ability to maintain concentration, persistence and pace."[110] In posing hypotheticals to the vocational expert, ALJ Lash included this limitation in both her questions.[111]

Mr. Myrick argues ALJ Lash's hypothetical questions addressed only the limitations on complexity of the tasks, and not "his limitations in sustaining concentration and completing those

13

tasks in a timely manner."[112] We disagree. ALJ Lash's hypothetical addressed the complexity of the tasks because it limited to "unskilled work with routine, repetitive tasks." ALJ Lash's hypothetical also included Mr. Myrick's limitations on concentration because she qualified unskilled work with a "moderate limitation in the ability to maintain, concentration, persistence, and pace."

Mr. Myrick argues ALJ Lash erred based on our holding in *McPherson v. Colvin*, where we remanded based on inadequacies in an ALJ's hypothetical question.[113] In *McPherson*, the ALJ found Ms. McPherson had moderate deficiencies in concentration, persistence, and pace.[114] The ALJ then posed a hypothetical question with limitations of "routine, repetitive tasks," "a low stress environment," and "no public interaction and occasional interaction with coworkers and supervisors."[115] We found the ALJ's hypothetical question did not address all of Ms. McPherson's limitations because a "limitation to 'routine, repetitive tasks' accounts for the skill level required for the work, but necessarily the level of concentration required for the work" and remanded the case.[116]

Again, Mr. Myrick has a different case. ALJ Lash found Mr. Myrick had "moderate difficulties" maintaining his concentration, persistence, pace and included this limitation in her hypothetical by limiting him to unskilled work "secondary to a moderate limitation in the ability to maintain concentration, persistence and pace."[117] Unlike *McPherson*, Mr. Myrick does not identify a mental impairment found by ALJ Lash but not included as a limitation in her hypothetical question to the vocational expert. We distinguish Mr. Myrick's objection because ALJ Lash did not err in her hypothetical question to the vocational expert Mr. Dennison and did not err in relying on the vocational expert's testimony as a result.

14

## III. Conclusion

In an accompanying order, we deny Mr. Myrick's Petition for Review and dismiss his complaint. Our review today is not based on whether we would arrive at the same conclusion as ALJ Lash. We only determine whether ALJ Lash's findings are based on substantial evidence after considering the weight assigned to the adduced evidence. ALJ Lash provided adequate reasons for finding the objective medical evidence do not support Mr. Myrick's subjective complaints of pain and finding Mr. Myrick capable of medium work with additional limitations. ALJ Lash also adequately included all of Mr. Myrick's limitations in her hypothetical to the vocational expert and did not err in relying on the expert's testimony. We deny Mr. Myrick's objections and affirm ALJ Lash's findings as supported by substantial evidence.

---

[1] ECF Doc. No. 8, Social Security Administrative Record ("R.") at 41, 43.

[2] R. 288.

[3] R. 38.

[4] R. 38.

[5] R. 288.

[6] R. 314.

[7] R. 284.

[8] R. 283.

[9] R. 282.

[10] R. 282.

[11] R. 258.

[12] R. 258.

---

[13] R. 21.

[14] R. 290.

[15] R. 76.

[16] R. 289.

[17] R. 290.

[18] R. 78.

[19] R. 79.

[20] R. 79.

[21] R. 367.

[22] R. 370.

[23] R. 388-390.

[24] R. 345.

[25] R. 347.

[26] R. 378.

[27] R. 356.

[28] R. 357.

[29] R. 545.

[30] R. 561.

[31] R. 496.

[32] R. 521.

[33] R. 521.

[34] R. 501.

---

[35] R. 501.

[36] R. 501.

[37] R. 502.

[38] R. 502.

[39] R. 502.

[40] R. 464.

[41] R. 464, 466.

[42] R. 45.

[43] R. 52, 205.

[44] R. 52, 55.

[45] R. 53, 206.

[46] R. 53.

[47] R. 60.

[48] R. 209.

[49] R. 209.

[50] R. 211.

[51] R. 59.

[52] R. 57.

[53] R. 43.

[54] R. 21.

[55] R. 21.

[56] R. 21.

[57] R. 21.

[58] R. 31.

[59] R. 30.

[60] R. 23.

[61] R. 24.

[62] R. 24.

[63] R. 24.

[64] R. 6.

[65] R. 26-27.

[66] R. 27.

[67] R. 28.

[68] R. 28.

[69] R. 30.

[70] R. 26.

[71] R. 26.

[72] R. 29.

[73] R. 62.

[74] R. 62.

[75] R. 61-62.

[76] R. 30.

[77] ECF Doc. No. 13 at 4.

[78] *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)).

⁷⁹ *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)).

⁸⁰ *Id.* (quoting *Rutherford*, 399 F.3d at 552) (internal quotations omitted).

⁸¹ *Id.* (citing *Schaudeck v. Comm'r*, 181 F.3d 429, 431 (3d Cir.1999)).

⁸² *Trinh v. Astrue*, 900 F. Supp. 2d 515, 518 (E.D. Pa. 2012) (citing *Fargnoli v.Massanari*, 247 F.3d 34, 38 (3d Cir. 2001)).

⁸³ 42 U.S.C. § 423(a)(1)(D).

⁸⁴ 42 U.S.C. § 1381 *et seq.*

⁸⁵ 42 U.S.C. § 423(d)(1)(A); § 1382c(a)(3)(A).

⁸⁶ *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

⁸⁷ *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004).

⁸⁸ 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

⁸⁹ *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability if claimant is engaged in substantial gainful activity).

⁹⁰ *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability if claimant's impairments are not severe).

⁹¹ *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

⁹² *Id.*

⁹³ *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

⁹⁴ *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001).

⁹⁵ 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). *Plummer*, 186 F.3d at 428.

⁹⁶ R. 26.

⁹⁷ *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) and *Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir. 1986)).

⁹⁸ R. 28.

[99] R. 284.

[100] 20 C.F.R. § 416.929(c)(3)(1).

[101] 637 F.3d 968 (3d Cir. 1981).

[102] *Id.* at 970.

[103] *Id.* at 971.

[104] *Id.* at 972.

[105] *See id.*

[106] ECF Doc. No. 13 at 4.

[107] *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).

[108] *Id.*

[109] R. 25.

[110] R. 26.

[111] R. 61-62.

[112] ECF Doc. No. 13 at 14.

[113] No. 16-14-69, 2016 WL 5404471 (E.D. Pa. Sept. 28, 2016).

[114] *Id.* at *8.

[115] *Id.*

[116] *Id.*

[117] R. 25.